Brandon M. Tesser (SBN 168476)
Robert Peredes (SBN 255329)
Isaac H. Klipstein (SBN 360436)
**TESSER | GROSSMAN LLP**
11726 San Vicente Blvd., Suite 450
Los Angeles, California 90049
Tel: (310) 207-4558
Email: Brandon@tessergrossman.com
Robert@tessergrossman.com
Isaac@tessergrossman.com

Attorneys for Plaintiff CARLSON LLC

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CARLSON LLC, a Nevada limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>ANTHROPIC PBC, a Delaware public benefit corporation; META PLATFORMS, INC., a Delaware corporation; DOES 1–20<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR**<br><br>**1. DIRECT COPYRIGHT INFRINGEMENT**<br><br>**2. VICARIOUS COPYRIGHT INFRINGEMENT**<br><br>**3. CONTRIBUTORY COPYRIGHT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Carlson LLC alleges as follows:

## I

## PARTIES

1. Carlson LLC ("Carlson") is a Nevada limited liability company. Carlson is the registered copyright owner of literary works written by Richard Carlson and Kristine Carlson. A non-exhaustive list of the works by Richard and Kristine Carlson is attached hereto as **Exhibit A** and is incorporated herein by reference.

2. Defendant Anthropic PBC ("Anthropic") is a Delaware public benefit corporation. Its principal place of business is in San Francisco, California.

3. Defendant Meta Platforms, Inc. ("Meta") is a Delaware corporation. Its principal place of business is in Menlo Park, California.

4. Carlson is ignorant of the true names and capacities of the Defendants sued herein as Does 1-20, inclusive, and therefore sues these Defendants by such fictitious names. Carlson will amend this Complaint to allege the true names and capacities when ascertained. Carlson is informed and believes, and on that basis alleges, that each of the fictitiously-named Defendants is responsible in some matter or capacity for the wrongful conduct alleged herein, and that Carlson's loss as alleged herein was proximately and/or directly caused by such Defendants' acts.

## II

## JURISDICTION AND VENUE

5. Jurisdiction: This court has subject matter jurisdiction over this action because it arises under the laws of the United States, 28 U.S.C. § 1331. Specifically, it arises under an Act of Congress relating to copyrights, 28 U.S.C. § 1338, the Copyright Act of 1976, as amended, 17 U.S.C. § 101 *et seq.*

6. Divisional Assignment: Assignment and venue is proper in this district pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

///

## III

## NATURE OF THE ACTION

7. When Richard Carlson, Ph.D released *Don't Sweat the Small Stuff . . . and It's All Small Stuff* ("*Don't Sweat*") in 1997, it became an instant classic of the self-help genre. It immediately struck a chord with a massive audience, teaching people practical steps to become happier and less stressed. It made publishing history as USA Today's bestselling book for two consecutive years, and spent over 100 weeks on the New York Times bestseller list. It has been translated into over 30 languages and published in 135 countries.

8. Richard Carlson quickly became one of the most sought-after lecturers and talk-show guests: in the decade between the publication of *Don't Sweat* and his death, Richard Carlson made *thousands* of television appearances on shows like The Oprah Winfrey Show, The Today Show, and The View. Sensing he had struck a chord with an audience seeking to become happier and less stressed, Richard Carlson continued to write and publish, largely under the *Don't Sweat* brand – clear, practical, digestible works, such as *Don't Sweat the Small Stuff With Your Family* (1997), *Don't Sweat the Small Stuff at Work* (1999), and *What About the Big Stuff* (2002). . Richard Carlson's oeuvre includes *Don't Sweat* products, such as calendars, *Don't Sweat* seminars and lectures, and literary works outside the *Don't Sweat* series, such as *Don't Worry, Make Money* (1997) and *Don't Get Scrooged* (2006).

9. Kristine Carlson also contributed to the *Don't Sweat* series, including as a coauthor (with her husband Richard) of *Don't Sweat the Small Stuff in Love* (2000), *Don't Sweat the Small Stuff for Women* (2001), and *Don't Sweat the Small Stuff for Moms* (2012). Kristine Carlson continued to write after her husband's passing, including *From Heartbreak to Wholeness: The Hero's Journey to Joy* (2018), and *Heartbroken Open: A Memoir Through Loss to Self-Discovery* (2010), which was

adapted into a Lifetime film, DON'T SWEAT THE SMALL STUFF: THE KRISTINE CARLSON STORY, released in 2021.

10. Richard Carlson and Kristine Carlson's literary works, the "Carlson Works," contain carefully crafted creative expression grounded in human experiences. Carlson LLC, solely managed by Kristine Carlson, administers copyright in and licenses the Carlson Works.

11. Anthropic is an artificial intelligence company. Anthropic develops artificial intelligence ("AI") models and related products. Anthropic's core offering is Claude, a large language model ("LLM").[1] Claude is central to Anthropic's business success.

12. Anthropic has had significant business success: in recent months, estimates of Anthropic's valuation have skyrocketed to over $2 *trillion*.

13. Defendant Meta is a multi-trillion dollar technology company, generating over $60 billion in revenue every quarter, best known for its social media services Facebook, Instagram, and WhatsApp. Meta also develops LLMs and related products, including the Llama and Muse model families. Meta provides those models to the public, and uses them to power its products, such as the Meta AI virtual assistant.

14. Defendant's flagship LLMs drive such intense revenue because they work – and they work, because they were "trained" using high-quality training data. Two courts in this district have found that published books provide essential high-quality training data:

a. "Books make for especially valuable training data" for Meta. *Kadrey v. Meta Platforms, Inc*., 788 F. Supp. 3d 1026, 1039 (N.D. Cal. 2025) ("*Kadrey*"). Books have qualities AI developers want their models

[1] An LLM is a type of generative AI model designed to process user prompts and generate text, such as to draft emails, summarize documents, write books, etc. LLM developers perform intense statistical analysis on *large* quantities of *language* to *model* the relationships between "tokens" – words and punctuation – in its training data. An LLM's ability to answer user prompts in a cogent and helpful way is an emergent property of this "training" process.

to emulate via training: they are long-form, consistent, well-written, clear, factually accurate, and marketable. Id.

b. Anthropic values books "because of the creative expressions they contained. Claude's customers wanted Claude to write as accurately and compellingly as [authors of books] so it was best to train the LLMs underlying Claude" using books. *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1015 (N.D. Cal. 2025) ("*Bartz*").[2]

15. Defendants extracted significant value from the literary works of published authors. Defendants did not obtain licenses, credit, or compensate book authors or publishers.

16. Meta torrented millions of works, including the Books3 database, from notorious "shadow libraries" such as Anna's Archive, Library Genesis ("LibGen"), Z-Library, and others. *Kadrey*, 788 F. Supp. 3d at 1040–1041. Meta opted to abandon licensing negotiations following its torrenting efforts. *Id.*

17. Anthropic torrented millions of works, including from Books3, LibGen, and the Pirate Library Mirror (PiLiMi). *Bartz,* 787 F. Supp. 3d at 1015, 1027. Anthropic dreaded the "legal/practice/business slog" of licensing books for training, so it "stole" them instead. *Id.*

18. Books3, LibGen, PiLiMi, and Anna's Archive, contain Carlson Works. A search of Books3 using the Atlantic's Books3 index search, reveals at least ten Carlson Works are indexed in Books3. A search of LibGen using the Atlantic's LibGen index reveals around twenty Carlson Works are indexed in LibGen.

///

---

[2] In *Bartz*, the court certified the class of copyright owners of literary works whose works Anthropic downloaded from two pirate websites. Carlson received notice that Carlson was a class member. Therefore, Carlson is informed and believes that the court's description of Anthropic's conduct in *Bartz* as to literary works, likewise describes Anthropic's conduct as to Carlson Works.

19. Defendants torrented the Carlson Works, thereby making new copies without authorization, and made many additional copies of the Carlson Works in the training process:

a. Anthropic made several additional copies at various stages of its training and research processes, "so many times that Anthropic admits it would be impractical even to estimate." *Bartz*, 787 F. Supp. 3d at 1017.

b. Meta similarly made many additional copies in the course of training. *Kadrey*¸ 788 F. Supp. 3d at 1041–1043.

20. Defendants have maintained that their conduct, namely, the overall process of training AI using copyrighted works, is protected by fair use. Not so. Two courts in this district have evaluated the defense in the context of AI training using books; both have suggested that at least some of Defendants' uses were not fair:

a. In *Bartz*, the court held that Anthropic's reliance on piracy to populate its general-purpose library was not fair use, even if some of those works were then used in AI training, which could be fair use. 787 F. Supp. 3d at 1019.

b. In *Kadrey*, the court suggested it was "hard to imagine" that training an AI on books, "enabling the creation of a potentially endless stream of competing works," could be fair. 787 F. Supp. 3d at 1059.

21. In short: Defendants copied and used the Carlson Works without consent or compensation. They made countless copies and derivatives of the Carlson Works without authorization, violating Carlson's exclusive rights under U.S. copyright law. Defendants used the Carlson Works, among others, to amass hundreds of billions of dollars in annual revenue. Defendants intended for their products to supplant the market for the Carlson Works — and they succeeded.

///

## IV

## FACTUAL ALLEGATIONS

### A. Defendants Copied Books from Notorious Pirate Websites.

22. The Carlson Works are available on illicitly assembled databases, such as Books3, and through torrenting on pirate websites, sometimes called "shadow libraries." Such pirate websites include Library Genesis ("LibGen"), the Pirate Library Mirror ("PiLiMi"),[3] Z-Library, and Anna's Archive.

23. Defendants obtained the Carlson Works from these pirate websites. They did so in two ways: first, by downloading the Books3 database, either directly or from The Pile; second, by torrenting[4] books directly from pirate websites.

#### *a. Defendants Copied the Carlson Works by Downloading the Books3 Dataset, Knowing Books3 Contained Infringing Material*

24. Books3 is a dataset containing a copy of bibliotik, a pirate website containing books.

25. Books3 contains at least eight Carlson Works, according to he Atlantic's searchable index of Books3.[5]

---

[3] *See, e.g.,* Anna's Blog, *Introducing the Pirate Library Mirror: Preserving 7TB of books (that are not in Libgen)*, Anna's Archive (July 1, 2022) ("We deliberately violate the copyright law in most countries. . . . [W]e have mirrored a popular (and illegal) library.").

[4] Torrenting is a process of transmitting and acquiring computer files. *See Kadrey*, 788 F. Supp. 3d at 1041. Torrenting involves downloading from decentralized networks. Such decentralization makes torrenting attractive to infringers: storing parts of files, rather than whole files, makes it harder to identify and prove infringement, and because the file is distributed across a large network of nodes, taking down any single node (i.e. by DMCA takedown procedures or enforcement actions) will not meaningfully reduce access across the network.

[5] ATLANTIC, "AI Watchdog: Books3" (Sep. 10, 2025), https://www.theatlantic.com/technology/archive/2025/09/dataset-books3/683662/ (Search results for Richard Carlson and Kristine Carlson include: 1. *Don't Sweat the Small Stuff in Love: Simple Ways to Nurture and Strengthen Your Relationship;* 2. *Don't Get Scrooged: How to Thrive in a World Full of Obnoxious, Incompetent, Arrogant, and Downright Mean-Spirited People*; 3. *Don't Sweat the Small Stuff for Men: Simple Ways to Minimize Stress in a Competitive World;* 4. *Don't Sweat the Small Stuff with Your Family: Simple Ways to Keep Daily Responsibilities from Taking Over Your Life;* 5. *Don't Sweat the Small Stuff and It's All Small Stuff: Simple Ways To Keep The Little Things From Taking Over Your Life;* 6. *Don't Sweat the Small Stuff at Work;* 7. *Don't Sweat the Small Stuff for Teens: Simple Ways to Keep Your Cool in Stressful Times;* and 8. *From Heartbreak to Wholeness: The Hero's Journey to Joy.*)

26. In December 2020, a group of developers assembled "the Pile," an open-source collection of datasets, including Books3, which they note is "almost entirely comprised of copyrighted works."[6] For several years, developers used the Pile as foundational data for LLM training.

27. Anthropic torrented Books3 from the Pile in or around February 2021. *Bartz*, 787 F. Supp. 3d at 1015. Anthropic knew Books3 was assembled from pirated works. *Id.* Anthropic continued to use the Books3 dataset at least until May 2024.[7]

28. Meta torrented Books3 from the Pile before February 2023 and used it to train Llama models. Meta AI, *LLaMA: Open and Efficient Foundation Language Models*, ARXIV, 2 (2023) (training data includes two book datasets: Project Gutenberg, books in the public domain; and books3, books which are merely "publicly available"); *see Kadrey*, 788 F. Supp. 3d at 1040. Meta knew or should have known Books3 was assembled using copyrighted works, because the creator of Books3 disclosed that it was assembled by copying a pirate website, and because the assemblers of the Pile disclosed Books3 was "almost entirely comprised of copyrighted works."

***b. Defendants torrented the Carlson Works Directly from LibGen, knowing LibGen contained infringing material.***

29. LibGen is a pirate website containing millions of copyrighted books in digital format, among other (mostly literary) works.

30. LibGen contains around thirty Carlson Works, according to the Atlantic's LibGen index search tool.[8]

---

[6] Bidermen et al., *Datasheet for the Pile*, ARXIV, 14 (2022), https://arxiv.org/pdf/2201.07311.

[7] Decl. of Ben Zhao, *Bartz v. Anthropic PBC*, No 3:24-cv-05417, ECF No. 560-6 at ¶21 (N.D. Cal. Jan. 1, 2026).

[8] Alex Reisner, *Search LibGen, the Pirated-Books Database That Meta Used to Train AI*, ATLANTIC (March 20, 2025), https://www.theatlantic.com/technology/archive/2025/03/search-libgen-data-set/682094/ (search results include 26 distinct works and five translated editions).

31. Anthropic torrented unauthorized copies of over five million books from LibGen in or around June 2021, knowing LibGen contained pirated material. *Bartz*, 787 F. Supp. 3d at 1015,

32. Meta torrented all of LibGen in or around October 2022. *Kadrey*, 788 F. Supp. 3d at 1040–1041. It does not dispute that it did so. *Id.* Meta knew or should have known that LibGen contained pirated material. *See* Declaration of Joshua M. Stein, Ex. A at 211699, *Kadrey v. Meta*, 3:23-cv-03417-VC (N.D. Cal. Jan. 14, 2025), ECF No. 391-24 (Meta personnel emails discussing risks to lobbying efforts "if there is media coverage suggesting we have used a dataset we know to be pirated, such as LibGen.").

***c. Defendants torrented the Carlson Works directly from PiLiMi/Anna's Archive, knowing PiLiMi/Anna's Archive contained infringing material.***

33. Other pirate websites copied and expanded on LibGen's catalogue. First, Z-Library mirrored LibGen, and expanded the catalogue dramatically. Then, the Pirate Library Mirror, "PiLiMi," mirrored Z-Library, and again expanded the catalogue. Then, PiLiMi member shifted to Anna's Archive, which once again copied Z-Library and LibGen and expanded its assets and functionality.

34. Anna's Archive claims "virtually all major companies building LLMs contacted us to train on our data."[9] Enterprise-scale users, such as LLM developers, can obtain high-speed torrents and access to unreleased collections by paying pirate websites tens of thousands of dollars and/or by providing data enrichment services.

///

---

[9] Anna's Archive, *Copyright Reform is Necessary for National Security* (Jan. 31, 2025). Accessed online, https://annas-archive.gl/blog/ai-copyright.html; Anna's Archive, *LLM Data*, https://annas-archive.gl/llm (offering "enterprise-level access" in exchange for "donations" or "enrichment of our data"); *see also* Anna's Archive, *If you're an LLM, please read this*, https://annas-archive.gl/blog/llms-txt.html (stating LLMs "have likely been trained in part on our data," and soliciting payment for "convenient programmatic open access. . . [and] fast SFTP access to all files, which is faster than torrents.").

35. Anthropic torrented PiLiMi in or around July and August 2022. *Bartz*, 787 F. Supp. 3d at 1015.

36. Meta torrented Anna's Archive in or around early 2024. *Kadrey*, 788 F. Supp. 3d at 1041.

37. Insofar as Z-Library, PiLiMi, and Anna's Archive contain LibGen, and have added additional pirated works to their holdings, *at least* thirty Carlson works are contained in these databases, which Defendants torrented.

38. "Torrenting" means more than merely "downloading." Every user who downloads a file becomes part of the network that distributes it via a process known as "seeding."[10] On information and belief, Defendant's "seeding" contributed to further downloads and, by participating in the decentralized network, Defendants increased the piracy ring's resilience to enforcement efforts.

39. Anna's Archive and PiLiMi, at least, have suggested that they have spoken to virtually all major AI companies and simultaneously, those websites have offered "enterprise-level" access in exchange for money or services. Defendants engaged in torrenting from those websites at enterprise scale. On this basis, Carlson believes and alleges that Defendants paid, or provided services, to facilitate high-speed torrent downloads, obtain "unreleased" datasets, and otherwise to torrent copyrighted literary works, including the Carlson Works. This conduct materially contributed to and induced ongoing infringement by the shadow libraries and associated piracy operations.

**B. Defendants Copied Physical Books**

40. Anthropic internally discussed moving away from such pirated books "for legal reasons." *Bartz*, 787 F. Supp. 3d at 1015.

///

[10] "Every user downloading the file [via torrenting] becomes part of the network that's distributing it," simultaneously downloading distributed files (leeching) and uploading partial files (seeding). David Gewirtz, *What is torrenting? BitTorrent, legal issues, how it works, and more*. ZDNET (Aug. 6, 2024), https://www.zdnet.com/article/what-is-torrenting-and-how-does-it-work/).

41. Anthropic hired Tom Turvey as Vice President, Product Partnerships, to obtain "all the books in the world" while avoiding the "legal/practice/business slog" necessary to license those literary works. *Bartz*, 787 F. Supp. 3d at 1015–1016.

42. "Anthropic spent many millions of dollars to purchase millions of print books," beginning in or around February 2024, and contracted with service provider(s) to create digital copies of those print books (the "Anthropic Scanned Works"). *Bartz*, 787 F. Supp. 3d at 1016.

43. Anthropic did not obtain rightsholder permission to create derivative digital copies of print works.

44. Upon information and belief, Anthropic had the right and ability to supervise and control the service provider(s) who digitized the print books, and, because the scanned copies were then used to train revenue-generating AI products, Anthropic received direct financial benefit therefrom. Moreover, by providing its service providers with print books, instructions, metadata standards, and by inducing the service providers to digitize the print books, they materially induced said copying.

45. Meta acquired physical copies of books for use in training LLMs, beginning in or around mid-2025. Meta scanned the physical copies into digital, machine-readable form (the "Meta Scanned Works," and together with the Anthropic Scanned Works, the "Scanned Works").

46. Meta did not obtain rightsholder permission to create derivative digital copies of print works.

47. Meta made further copies of the Meta Scanned Works, including during the training process whereby Meta developed Muse Spark and Muse Glimmer.

48. Upon information and belief, the Scanned Works include the Carlson Works.

### C. Defendants Used the Carlson Works to Train AI

49. Each instance of copying is an independent act of infringement. Fair use thus looks to each use of each copy; "the same copying may be fair when used for one purpose but not another." *See Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 533 (2023). Where a copy is used in multiple ways, each such use may be evaluated. *Id.* Thus, even where *some* uses and incidental infringement may be deemed "fair," others may not be. *Id.*, *see also Bartz*, 787 F. Supp. 3d at 1020.

50. Defendants downloaded pirated copies of the Carlson Works, thereby creating unauthorized copies of the Carlson Works, an act of infringement.

51. Defendant Anthropic created derivative copies of the Carlson Works by scanning physical copies of those works.[11]

52. Defendants created additional copies of the Carlson Works, such as to assemble new datasets or sub-sets, an act of infringement.

53. Defendants created derivative versions of the Carlson Works by converting them to new file formats, and by removing elements such as tables of contents, indices, and page numbers.

54. LLMs compete with the work on which they are trained. An individual seeking self-help material may turn to LLMs for advice; LLMs could not provide such advice but for training on self-help material. An individual seeking self-help material may turn to self-help books instead. But Defendant's products have been used to crowd out human authors in that market, too. One study found that in fall 2025, 77% of new uploads in Amazon's self-help subcategory "Success" were

[11] *See Authors Guild, Inc. v. HathiTrust,* 755 F.3d 87, 95 (2d Cir. 2014) ("Paradigmatic examples of derivative works include . . . the recasting of a novel as an e-book."); *see also Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 174 (2d Cir. 2024) (nonprofit organization did not make fair use of literary works by digitizing books for subsequent distribution, even where it imposed measures not to affect the total number of publicly circulated books).

likely written by AI.[12] Such books directly compete with the Carlson Works.

55. Carlson did not discover infringement prior to receiving notice that Carlson was a class member in *Bartz* eligible to opt into a proposed settlement, in or around December 2025. Carlson opted out of the proposed settlement: the Carlson Works are more valuable than other works in the class (as bestsellers with a long and successful history) and have been directly harmed by competition from LLMs (which most books in the class cannot demonstrate).

## V

## FIRST CLAIM FOR RELIEF FOR DIRECT COPYRIGHT INFRINGEMENT

**(Against All Defendants)**

56. Carlson repeats and incorporates herein by reference all of the allegations set forth above as though fully set forth herein.

57. As set forth in detail above, Carlson is the valid copyright owner of the Carlson's Works, and has the exclusive right to grant licenses for reproduction, the preparation of derivative works, and all other exclusive copyrights. 17 U.S.C. §106.

58. Defendants reproduced the Carlson's Works repeatedly and without authorization, when they downloaded the Books3 dataset, when they torrented LibGen, PiLiMi, and Anna's Archive.

59. Anthropic created further unauthorized reproductions when it scanned print copies of Carlson's Works.

60. Defendants created still further copies throughout the process of assembling libraries, curating datasets, and using those datasets for training.

61. Defendants prepared derivative works based on Carlson's Works, repeatedly and without authorization. Such derivative works include format changes, the removal of certain elements (such as copyright notices, page numbers

[12] Michael Fraiman, *77% of all "Success" Self-Help Books on Amazon are Likely AI,* Originality.ai (Jan. 28, 2026), https://originality.ai/blog/likely-ai-success-self-help-book-study.

and tables of content), and partial copies of works made during training. Anthropic scanned or copied print versions of Carlson's Works, creating a digital version.

62. Pursuant to 17 U.S.C. § 504(c)(2), on information and belief, Defendants engaged in acts that infringed the copyright, and knew that those acts were infringing, or Defendants acted with reckless disregard for, or willful blindness to, the copyright holder's rights, including as described above.

63. Pursuant to 17 U.S.C. § 504(c), as a direct and proximate result of Defendants' direct infringement of Carlson's copyrights, Carlson is entitled to recover up to $150,000 in statutory damages for each of the Carlson Works. Alternatively, at Carlson's election, pursuant to 17 U.S.C. § 504(b), it is entitled to its damages, including Defendants' profits from infringement, in connection with Carlson's Works as will be proven at trial.

64. Carlson is also entitled to recover attorney's fees and costs pursuant to 17 U.S.C. § 505 and prejudgment interest according to law.

## SECOND CLAIM FOR RELIEF FOR VICARIOUS COPYRIGHT INFRINGEMENT

**(Against All Defendants)**

65. Carlson repeats and incorporates herein by reference all of the allegations set forth above as though fully set forth herein.

66. Defendants directly benefited financially from the infringing activity of service providers who scanned print books of Carlson's Works, because they use those scans to populate a research library, and they use those scans to train AI models.

67. Defendants had the right and ability to supervise and control the infringing activity of the service providers who scanned print books of the Carlson Works.

///

68. Defendants failed to exercise their right and ability to supervise and control the service providers who scanned print books of the Carlson Works to prevent their infringement.

69. Pursuant to 17 U.S.C. § 504(c), as a direct and proximate result of Defendants' vicarious infringement of Carlson's copyrights, Carlson is entitled to recover up to $150,000 in statutory damages for each of the Carlson Works. Alternatively, at Carlson's election, pursuant to 17 U.S.C. § 504(b), it is entitled to its damages, including Defendants' profits from infringement, in connection with the Carlson Works as will be proven at trial.

70. Carlson is also entitled to recover attorney's fees and costs pursuant to 17 U.S.C. § 505 and prejudgment interest according to law.

**THIRD CLAIM FOR RELIEF FOR**
**CONTRIBUTORY COPYRIGHT INFRINGEMENT**
**(Against All Defendants)**

71. Carlson repeats and incorporates herein by reference all of the allegations set forth above as though fully set forth herein.

72. On information and belief, Defendants contributed to copyright infringement when it torrented pirated works, and when Defendants instructed agents, contractors, service providers, or third parties to make copies of the Carlson Works at various stages in the acquisition, preparation, and training processes.

73. Defendants knew or had reason to know of the infringing activity of other named Defendants, service providers, and pirate websites, each a direct infringer.

74. Defendants intentionally induced and materially contributed to the infringing activity, for example, by providing instructions, money, services, and other resources to each direct infringer, in exchange for access to pirated, digitized, and/or materially altered copies of copyrighted works, including Carlson's Works.

75. Defendants took affirmative steps, including by providing instructions, money, services, and other resources to each direct infringer, and showed by clear expression, including by activating torrenting protocols, engaging with pirate websites, engaging with service providers, and speaking with other named Defendants, their intent to encourage that direct infringement.

76. Pursuant to 17 U.S.C. § 504(c), as a direct and proximate result of Defendants' contributor infringement of Carlson's copyrights, Carlson is entitled to recover up to $150,000 in statutory damages for each of the Carlson Works. Alternatively, at Carlson's election, pursuant to 17 U.S.C. § 504(b), it is entitled to its damages, including Defendants' profits from infringement, in connection with Carlson's Works as will be proven at trial.

77. Carlson is also entitled to recover attorney's fees and costs pursuant to 17 U.S.C. § 505 and prejudgment interest according to law.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

## PRAYER FOR RELIEF

WHEREFORE, for each Cause of Action, Carlson prays for judgment as follows:

78. For an award of damages, including actual damages and any gains, profits and advantages, obtained by Defendants as a result of their acts of infringement in an amount according to proof;

79. For an award of statutory damages in an amount of up to $150,000 for each of Carlson's Works infringed according to proof at the time of trial;

80. For preliminary and permanent injunctions sufficient to prohibit Defendants from infringing, in any manner, Carlson's Works;

81. For costs of suit, including reasonable attorneys fees pursuant to 17 U.S.C. § 505;

82. For prejudgment interest at the legal rate; and

83. For such other and further relief as the Court deems just and proper.

Dated: November 18, 2026

TESSER | GROSSMAN LLP
BRANDON M. TESSER
ROBERT PAREDES
ISAAC H. KLIPSTEIN



BRANDON M. TESSER
Attorneys for Plaintiff
CARLSON LLC

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all claims for relief which may be tried to a jury.

Dated: November 18, 2026

TESSER | GROSSMAN LLP
BRANDON M. TESSER
ROBERT PAREDES
ISAAC H. KLIPSTEIN

/s/ B M Tesser

BRANDON M. TESSER
Attorneys for Plaintiff
CARLSON LLC

# EXHIBIT A

Carlson Works

| Copyright Registration No. | Title | Author(s) |
|---|---|---|
| TX0005233594 | Don't Sweat the Small Stuff in Love | Kristine Carlson; Richard Carlson |
| TX0005271732 | Don't Sweat the Small Stuff for Teens | Richard Carlson |
| TX0006174716 | Easier Than You Think ... because Life Doesn't Have to Be So Hard | Richard Carlson |
| TX0005411460 | Don't Sweat the Small Stuff ... and It's All Small Stuff | Richard Carlson |
| TX0006491265 | Don't Get Scrooged | Richard Carlson |
| TX0005772646 | The don't sweat guide for teachers : cutting through the clutter so that every day counts | Richard Carlson |
| TX0005329652 | Don't Sweat the Small Stuff at Work | Richard Carlson |
| TX0004543699 | Slowing Down to the Speed of Life | Richard Carlson; Joseph V. Bailey |
| TX0005461226 | Don't Sweat the Small Stuff for Men | Richard Carlson |
| TX0004704981 | You Can Be Happy No Matter What | Richard Carlson; Wayne Dyer |
| TX0004751694 | Don't Sweat the Small Stuff with Your Family | Richard Carlson |
| TX0004853407 | Don't Sweat the Small Stuff at Work | Richard Carlson |

| | | |
|---|---|---|
| TX0003728733 | You Can Feel Good Again: Common-Sense Strategies for Releasing Unhappiness and Changing Your Life<br>*Retitled 1997: *Stop Thinking, Start Living: Discover Lifelong Happiness* | Richard Carlson |
| TX0004461550 | Don't Sweat the Small Stuff | Richard Carlson |
| TX0007061863 | Hour to Live, An Hour to Love, An | Kristine Carlson |
| TX0008612549 | From Heartbreak to Wholeness | Kristine Carlson |
| TX0004678935 | Don't Worry, Make Money: Spiritual & Practical Ways To Create Abundance And More Fun In Your Life | Richard Carlson |
| TX0005313884 | Don't Sweat The Small Stuff About Money: Spiritual And Practical Ways To Create Abundance And More Fun In Your Life | Richard Carlson |
| TX0005383129 | Don't Sweat The Small Stuff For Women: Simple And Practical Ways To Do What Matters Most And Find Time For You | Kristine Carlson, Forward by Richard Carlson |
| TX0004712838 | Handbook For The Spirit | Edited by Richard Carlson |
| TX0006580604 | The Big Book Of Small Stuff: 100 Of The Best Inspirations From Don't Sweat The Small Stuff | Richard Carlson |
| TX0005460028 | The Don't Sweat Affirmations: 100 Inspirations To Help Make Your Life Happier And More Relaxed | Richard Carlson |

| | | |
|---|---|---|
| TX0005410105 | The Don't Sweat Guide For Couples: Ways To Be More Intimate, Loving And Stress-Free In Your Relationship | Richard Carlson |
| TX0004853407 | The Don't Sweat The Small Stuff Workbook: Exercises, Questions, And Self-Tests To Help You Keep The Little Things From Taking Over Your Life | Richard Carlson |
| TX0005743972 | What About The Big Stuff?: Finding Strength And Moving Forward When The Stakes Are High | Richard Carlson |
| TX0009648358 | Heartbroken Open : a memoir through loss to self-discovery | Kristine Carlson |

<u>Berne Member Country Editions of Carlson Works Identified on The Atlantic's Index of LibGen</u>:

| **Identifier** | **Title** | **Author(s)** |
|---|---|---|
| ISBN 10: 8425331994<br><br>ISBN 13: 9788425331992<br><br>Biblioteca Nacional de España | No Te Ahogues En Un Vaso De Agua (Don't Sweat the Small Stuff and It's All Small Stuff Spanish Language Edition) | Richard Carlson |

| | | |
|---|---|---|
| Depósito Legal: B-41995-1997 | | |
| ISBN13: 9781577310495<br><br>ISBN10: 1577310497 | Usted Si Puede Ser Feliz Pase Lo Que Pase: (You Can Be Happy No Matter What Spanish Language Edition) | Richard Carlson |
| ISBN13: 9788372275042<br>ISBN10: 8372275041 | Zapomnij O Kłopotach, Zasmakuj W Banknotach (Don't Worry, Make Money, Poland / Polish Edition) | Richard Carlson |
| ISBN10: 8532510671<br><br>ISBN 13: 978-8532510679 | Não Faça Tempestade Em Copo D'água No Trabalho (Don't Sweat the Small Stuff at Work, Brazil / Portugues Edition) | Richard Carlson |
| ISBN10: 9753371179<br><br>ISBN13: 978-9753371179 | Ufak Şeyleri Dert Etmeyin (Don't Sweat the Small Stuff, Turkish Edition) | Richard Carlson |